In re STATE POLICE LITIGATION.

CONNECTICUT CRIMINAL DEFENSE LAWYERS ASSOCIATION, Joseph Keefe, Individually and as President of Connecticut Criminal Defense Lawyers Association, John R. Gulash, William J. Sweeney, Denise Derby, Donald Couture, Timothy B. Young, Roderick Young, Barbara Schuyler, Conrad Seifert, Attorney, William Gerace, Attorney, Martin Minella, Attorney, William Dow, Jay Martin Sulzach, Attorney, Robert A. Skovgaard, Charles E. Skovgaard, James M. Higgins, Attorney, Kevin O'Brien, Attorney, Timothy Moynihan, Attorney, Mark Shapera, Joseph J. Masler, Paul Arvai, Eva Belline, Joseph Belline, Lisa M. Belline, Ismael Santiago, James C. Carbone, Frank Gonzalez, Jr., Jeffrey Irwin, David Garfield, John McBride, William Bruce, Theodore L. Callands, John David Panula, III, Carolyn M. Capozziello, Thomas W. Capozziello, A. Capozziello, Myron J. Stephenson, George Whitehead, Joseph A. Rich, Sr., Robert A. Rosa, Sonja Van Valkenburgh, Michael J. Mezzatesta, Susan Pregler, Richard Reardon, Manuel E. Ferriera, Gregory Hudson, Mathew A. Capozziello, Tom Ciarolo, David White, Rafael A. Cabrera, Michael West, Richard G. Paradis, Jeffrey Membrino, Daniel Membrino, Lorenzo Santropietro, Gene Mancino, Harold D. Nichols, Mark Nichols, Lisa Anderson, Raymond Mikolinski, Lorraine Mikolinski, William C. Rado, Charles W. Kasmer, James Reardon, Daniel Ferriera, Joseph A. Rich, Jr., Barbara Rich, John M. Lebel, Tonya Miller, Bryan S. Golemowski, David R. Capasso, Raymond Povinelli, Luke Warner, Charles F. Kimms, James E. Jones, Paul A. Larosa, James Masler, Adelgard L. Masler, Michael P. Pane, Carmelina L. Pane, Keith W. Rado, Ralph Shores, Joseph W. Miron, Adam J. Soares, Steve Hanford, Wayne M. Christinat, Kent Kelsey, Daniel Elsbree, William Parker, Deborah Arvai, Domenic Santilli, Brian Panetta, Stephanie Weinburg, David Weinberg, Allen D'Antinio, Thomas Gahan, Steven W. Krauss, Betty Little, David Little, Robert Little, James P. Janulet, Jeffrey Fluery, Glenn E. Coe, Anthony Galazan, Lawrence R. Smith, Juan Crespo, Thomas Gugliotti, William Lewis, James M. Cavanaugh, Henry L. Deschamps, Lee M. Elliott, Santo Franzo, Robert J. Geoghan, James Johnston, Donald W. Kulisch, Peter G. Lawson, William M. Lucas, Jr., Francis W. Martin, Bruce B. McIntyre, Ronald Nanfito, David R. Rannikko, Julian Rogowski, Daniel St. John, Norman A. Soucie, Charles L. Wargat, James P. Whelan, Richard Kehoe, Brian Panetta and Alphonso Green, Plaintiffs–Appellees,

Connecticut State Police Union, David Phipps, Robert Kowalcyzk, Martin White, Ana Ferreira, Samuel Mazzatesta, James O. Gaston, Scott B. Chamberlain, Michael Fitzpatrick, Michael Georgetti, Charles E. Skovgaard, Carmine Guiliano, Robert McCoy, Philip McKnight, Richard Stewart, David A. Moraghan, Denise Derby, Albert McGrail, Anthony C. Polvino, John A. Curtas, Alan Coppotelli, Charles Arcangelo, Claude J. Kramer, Charles Christiano, Jr., Carl H. Slusarczyk, Jr., Carl H. Slusarczyk, Sr., Irene Slusarczyk, Steve Battalino, Todd A. Bennet, Robert Gallo, Patricia Gallo, Fred Douglas, Lucy B. Douglas, Robin M. Cornut, Theodore, R. Callands, Thomas L. Birch, Elaine C.S. Bell, James C. Lamond, Shawn Henning, William H. Scruggs, George F. Sahadi, Michael Callands, John Ruggiero, Eric Hudson, Arlene Hudson, Michael Beckford, Robert Canning, Shawn Carier, William Cuddy, Jackie Durfee, Philip Fioretti, Edna George, Philip George, Gerald Golarz, Thaddeus Greb-

la, David Guillelmette, David Haines, Karen Hill, James Holcomb, Philip Janik, Yolanda Janik, Allen Januszewski, Frank Kennedy, George Kuda, Jonathan Lamson, Sami Lapides, Albert Losacano, James Brad McDonald, David McKenna, Tina Menegus, William Parker, Raymond Povinelli, David Ross, Bruce Shapiro, Peter Stanchak, Daniel Zsebik, David R. Lord, John J. Dunham, Ronald W. Gray, John Meneguzzo, Lisa J. Meneguzzo, Vince Lee, Cynthia Dubey, Anthony Consolini, Vivian Sambuco, Scott Buley, Beverly Polvino, Carl Fitzgibbons, Dale Tatem, Gaetano Marino, Terry L. Groeper, Joseph Albuquerque, Julie S. Albuquerque, Joseph Longo, Robert Quick, John Cleary, James Bradley, Terry L. Groeper, Joe E. Gorman, Paul Torbicki, Patricia J. Hundt, William Gildersleeve, Jane E. Walton, Don Dybvick, Peter M. O'Brien, Howard J. Osterhout, David Coleman, Kyle A. Taber, Raymond E. King, Rodney Clement, Michael L. Bochicchio, David Carey, Gerard Chartier, Theodore Derouin, William Dwyer, Harry Mottram, Richard D. Nicholson, Ormonde Osborne, Robert L. Ousterhoudt, John Ragazzi, Orlando Ramirez, Patrick T. Graham, Joe Laput, Thomas Shia, Kenneth Startz, Robert Anger, Thomas Nicoletti, R.W. Krysiak, David O'Keefe, Charles Revoir, Serge Samal, Robert Ross, Thomas Pietrini, Michael Cope, Richard D. Nicholson, Larry Ahearn, David Barger, Michael Bolton, David Devito, Joseph David Dynderski, Lee M. Elliott, Julio Fernandez, Jr., Richard B. Ford, Richard W. Gardner, Kenneth Gough, Michael Graham, Charles E. Gunn, R.W. Krysiak, Joseph Laput, Martin Lane, Willliam Robert MacIntosh, William MacLean, Malcolm R. Major, Henry Maynard, William McCasland, Carmelo Otero, Charles Ouellette, Kevin A. Rodino, Steve Salvatore, William Soukup, Peter Strniste, Martinique Zhigailo, Alexander Jones, Dwight Carlson, Erwin McKinney, David Hutchinson, Terrence Dunn, David Waddell, Frederick Downs, Eugene Terry, James Rogers, Sandra Brown, John Hill, Donald F. Lopresto, Raymond W. Shove, III, George M. Lawrence, Kenneth Wilson, Angelo F. Tosi, Mario A. Garofalo, William J. Barbour, Donald Barry, Robert Birge, Peter L. Considine, Enrico G. Soliani, Howard Smith, Peter R. Terenzi, III, Kevin McCarthy, Barrie Toothill And Arthur Von Holtz, Intervenors–Plaintiffs–Appellees,

v.

Lester J. FORST, John A. Mulligan, John Jacewicz, Michael Stergio, Warren T. Seeley, Raoul Oullette, Frederick Diggle, Thomas Elliott, William Smith, Edward Dailey, Peter Plante, Robert Offen, Robert O'Shaughnessy, Charles Levy, James Hiltz, Timothy Barry, Richard Levine, Rubin Bradford, James Reilly, State of Connecticut, Joseph Faughnan, Walter Scholtz, John F. Watson, George Moore, Donald Paige, John Bardelli, Robert Bessechek, Wilfred Blanchette, Henry Bourgeois, Vincent Brennan, Manfred Brideau, Richard Brozek, John Burke, John E. Brymer, Shaun Byrne, John Caputo, Dominic Console, Richard Covello, Frank D'Amico, James Darby, Richard Day, John Dewey, John Foley, Christopher Garrity, Errol Goffe, Paul Guillot, Bruce Haines, Patrick Hedge, Dorris Hughes, Robert Hull, George Huston, Paul Jaskolka, Anthony Kalkus, Peter J. Kennedy, Thomas Kenney, Cornelius Kerwin, William Kirkby, Kenneth Kirschner, John Leonard, John Leone, Donald Long, Paul L. Mallon, Douglas Manahan, Richard Maynard, John McGoldrick, James McGrath, Lawrence Merrill, Ronald Mikulka, James Mooney, Bernard Moran, Roger Morgan, Charles A. Morrison, Jr., Raymond Morse, John Mucherino, Lieutenant Myers, Donald Nurse, Scott O'Mara, David Paige, Joseph Palombizio, Joseph Perry, John Rearick, Trooper Reed, James Rice, Richard Rizzuti, Frank

Robinson, John Rofsky, James Rogers, Robert Root, Royal Schiffer, James Shay, James Smith, Charles Supsinskas, William Sydenham, John Taylor, Matthew Tyska, Raymond Watrous and Robert Welch, Defendants–Appellants.

No. 886, Docket 95–7614.

United States Court of Appeals, Second Circuit.

Argued Dec. 21, 1995.

Decided July 3, 1996.

Aaron S. Bayer, Deputy Attorney General, Hartford, Connecticut (Richard Blumenthal, Attorney General of Connecticut, Henri Alexandre, Carolyn K. Querijero, Jane R. Rosenberg, Assistant Attorneys General, Hartford, Connecticut, John W. Sitarz, Cooney, Scully & Dowling, Hartford, Connecticut, on the brief), for Defendants–Appellants.

Christopher D. Bernard, Bridgeport, Connecticut (Koskoff, Koskoff & Bieder, Bridgeport, Connecticut, Garrett M. Moore, Judith A. Mauzaka, Moore & O'Brien, Cheshire, Connecticut, on the brief), for Plaintiffs–Appellees and Intervenors–Plaintiffs–Appellees.

Before: KEARSE, MAHONEY and PARKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Lester J. Forst and other present and former officials of the Connecticut State Police ("State Police") appeal from so much of an order of the United States District Court for the District of Connecticut, T.F. Gilroy Daly, *Judge,* as denied their motion for summary judgment dismissing claims brought principally under 42 U.S.C. § 1983 (1994) and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1994) ("Title III"), alleging that between 1978 and 1989 the State Police intercepted, recorded, disclosed, and used, without knowledge or consent of the participants, all telephone calls made to, from, and within State Police barracks, in

violation of, *inter alia*, Title III and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The defendant officials sought summary judgment principally on the ground that they were entitled to qualified immunity. The district court denied that part of their motion on the ground that the rights of individual plaintiffs under the above laws were clearly established and that there are genuine issues to be tried as to pertinent factual issues, including (a) whether plaintiffs consented to the recording, and (b) whether and to what extent the State Police listened to any given recorded conversation. On appeal, defendants contend that they are entitled to qualified immunity principally because at the pertinent times it was not clearly established that tape-recording telephone calls, without ever listening to them, violated Title III or the federal Constitution or state law. Plaintiffs have moved to dismiss the appeal for lack of appellate jurisdiction. For the reasons below, we agree with plaintiffs that because the district court denied summary judgment on the ground that there existed questions of fact to be tried with respect to the qualified-immunity defense, the denial was not an immediately appealable order, and we therefore dismiss the appeal for lack of jurisdiction.

## I. BACKGROUND

This class action, a consolidation of several lawsuits, began in November 1989 after the public learned that for more than a decade the State Police had engaged in a practice of automatically recording telephone calls made on lines in each of its barracks. The plaintiff class, as certified by the district court, comprises all persons who participated in telephone calls to, from, or within State Police facilities between January 1, 1978, and November 9, 1989, whose calls were intercepted, recorded, and/or used by defendants in violation of law. The court also certified a plaintiff subclass of current and former State Police employees, other than those named as defendants, who participated in such calls.

The background of the litigation is set forth in detail in the district court's published opinion, *see* 888 F.Supp. 1235 (1995), and will be summarized here only to the extent pertinent to this appeal. Many of the facts are not in dispute.

### A. The State Police Policy and Practice of Recording Calls

The State Police is divided into three districts, each comprising four troops; each troop occupied its own barracks. In or before mid-1978, the State Police installed tape recorders on telephone lines in all 12 barracks plus its Headquarters Message Center. As explained by defendants, the tapes of the recordings "could be referred to in the ordinary course of police business and in furtherance of official police duties" in order to "investigate complaints made by the public against State Police personnel, e.g., internal affairs investigations"; or to "permit dispatchers to replay a communication when the message was not clear, e.g., to hear the street number"; or to "be used in major criminal investigations, e.g., to establish the time a complaint was received and when follow-up responses were made"; or to permit "a quality control check by the inspections unit to determine if the dispatchers and troopers were handling calls properly." (Defendants' Statement of Undisputed Facts ¶ 6.)

The machines installed by the State Police recorded incoming and outgoing calls indiscriminately. Although a 1978 State Police manual on wiretapping stated that a "call between a lawyer and a client presently the subject of criminal charges can under no circumstances be monitored," Office of the Chief State's Attorney Special Investigations Division Manual on Wire Tapping (1978) ("1978 Wire Tapping Manual"), when persons were arrested or detained and wished to call their attorneys, they were directed to a barracks telephone on which all conversations were routinely recorded. Nor did the State Police make any effort not to record incoming calls from attorneys to their clients.

*It was known by the State Police when these recording systems were installed, and at all subsequent times, that they recorded both incoming and outgoing calls; that they recorded specific telephone lines (onto which calls from all tele-*

phone handsets were routed automatically) rather than specific telephone handsets; *and that there existed no unrecorded lines dedicated for use by detainees, arrestees or suspects.*

888 F.Supp. at 1244 (emphases added).

Though the recorders used in the early years of the pertinent period used "beep tones" to alert call participants that their conversations were being recorded, "[b]y 1986 ... some recorded lines did not have beep tones." *Id.* at 1243. Although defendants asserted that the public was also on notice as to the recording practice because of statements in local area telephone books that calls to police, fire, and other emergency facilities could be recorded, the district court noted that this alert did not mention calls made from, rather than to, such facilities.

In 1983, the Connecticut Supreme Court decided *State v. Ferrell,* 191 Conn. 37, 463 A.2d 573 (1983) ("*Ferrell* "), which involved a murder conviction based, in part, on statements made by the defendant during one of two telephone conversations with his attorneys. Ferrell's incriminating statements were recounted at trial by State Police troopers who had heard his side of the conversation because the telephone they allowed him to use was in the barracks report room. Though the tape recordings of Ferrell's conversations were not admitted into evidence, a state trooper testified, apparently in an effort to show that when Ferrell spoke to his attorneys he had no reasonable expectation of privacy, that the calls were recorded and that there were periodic beeps to warn participants of the recording. The tapes were reviewed by the Connecticut Supreme Court, which found that in fact the recording of the defendant's call to his first attorney did not register a beep tone, and that the recording of an incoming call from his second attorney contained only "muted warning beeps." *Id.* at 39 n. 2, 463 A.2d at 575 n. 2. The court stated that although Ferrell's statements were not obtained by police interrogation or by "coercive measures appearing on the record," *id.* at 42, 463 A.2d at 576, Ferrell clearly had indicated his intention not to give the police a statement, and the interception of his statements to his attorney resulted in the very sort of self-incrimination that *Miranda* warnings are meant to guard against. The court ruled that the admission of the statements violated Ferrell's due process and *Miranda* rights. It stated that when access to an attorney is provided, "privacy must be ensured." *Id.* at 44, 463 A.2d at 578.

In the wake of *Ferrell,* defendant Ronald Mikulka, the State Police telecommunications chief, sent defendant Donald Nurse, head of the central district, a memorandum reflecting media comment on the *Ferrell* decision and suggesting that arrestees could be provided with an unrecorded line for calls to their attorneys:

> The attached article in the HTFD Courant (8/10/83) indicates that Police are obliged to provide a private telephone for accuseds to consult with their attorney.
>
> We should have a clear policy on this situation. If necessary we will arrange for the proper phone equipment. There are several options available. The simplest would be to provide a separate phone set with a local line that could be kept in the interrogation room and jacked in when needed.

(Mikulka memorandum dated August 11, 1983.) Notwithstanding this suggestion,

> Mikulka received no response to this memorandum, and he took no further steps to determine whether the State Police were recording attorney-client telephone calls. Indeed, at no time prior to November 1989 did the State Police enunciate a formal policy to assure an arrestee was provided access to an unrecorded telephone line.

888 F.Supp. at 1245.

In 1984, State Police Commissioner Forst requested an opinion from the Connecticut Attorney General with respect to the legality of intercepting wire or oral communications in a hostage or terrorist situation. He received an opinion indicating that no wire interceptions whatever were proper without judicial authorization:

> we conclude you may not intercept wire communications *even* in these circumstances without a warrant.

(Letter from Connecticut Attorney General Joseph I. Lieberman to Commissioner Forst

dated March 24, 1986, at 1 (emphasis added).)

In 1986, defendant John A. Mulligan, Forst's second-in-command, decided that, with the exception of the troop commander's private line and the informant's lines, recordings should still be made of all incoming and outgoing telephone lines. He also decided that the beep tones should be removed on all recorders and replaced by warning labels. Although such labels were eventually ordered and distributed, plaintiffs contend that in some barracks there was a period during which the beep tones had been eliminated and the labels had not yet been affixed; that in other barracks labels were promptly affixed but were not replaced after they had become worn or had been removed; and that in still others, warning labels were never affixed.

In January 1988, a revised State Police Administration and Operations Manual ("1988 Operations Manual") stated for the first time that recording machines had been installed in all barracks and the Headquarters Communications Section to record all radio and telephone conversations transmitted or received. It did not provide any guidelines covering the use of beep tones, warning labels, or other notification or consent procedures.

As noted, the tapes created by the State Police system did not distinguish between incoming and outgoing calls. Further, there was no way to determine, without listening to the tape, where a given call began and ended. Thus, when an officer

> reviewed tapes for administrative purposes[, he] generally took tapes from the barracks to a separate location, usually headquarters, and spent a full day reviewing them. . . .
>
> All internal investigations or inspections required a trooper to search for a conversation on a particular tape by listening to the entire tape until the specific conversation was identified. If information obtained in a tape recording was relevant to an internal affairs investigation, the

tape could be used against the employee in departmental hearings.

888 F.Supp. at 1246 (emphases added).

In 1989, the State Police recording practices came to the public's attention as a result of testimony given by a trooper on cross-examination in a pretrial hearing in *State v. Little*, CR4–156380, MV4–298174 (Nov. 3, 1989). The testimony revealed that after Little's arrest following a traffic accident, he had made four telephone calls from the barracks to which he had been taken, two to family members and two to his attorney. The calls had been recorded without his consent and without notice to him:

> No warning labels existed in the barracks or on the telephones themselves, there was no audible beep tone on the line Little used, and Little was neither advised of the recording nor told that he could have access to an unrecorded line.

888 F.Supp. at 1246–47; *see also* Deposition of State Police trooper Maryann Daley at 286.

These disclosures caused an uproar in the media, and the Governor called for and received Forst's immediate resignation. The district court noted that

> following his resignation Forst stated in an interview that both he and Mulligan were unaware that the recording system was recording all telephone calls, including those between suspects and their attorneys,

888 F.Supp. at 1247 n. 12, and that Mulligan similarly stated, " 'I think every single person of the management staff thought that there were lines available for conversations that were non-recorded,' " *id.* (quoting newspaper article quoting Mulligan).

B. *The Denial of Defendants' Summary Judgment Motion*

The plaintiffs in the present action include persons who were arrested by the State Police and made or received telephone calls while being detained at State Police barracks and criminal defense attorneys who made and received calls to and from their clients who were being detained at State Police barracks. The complaint, as amended through May 1991, alleged that defendants had en-

gaged in a widespread and secret program to intercept, record, disclose, or use wire and oral communications, in violation of numerous federal and state statutory and constitutional provisions. It demanded, *inter alia*, compensatory and punitive damages from the individual defendants in their individual capacities, an injunction prohibiting the defendant officials and the State of Connecticut from continuing to conduct unauthorized recording, and an injunction prohibiting disclosure of any recording without a court order.

After extensive discovery, the individual defendants moved for summary judgment on the principal grounds (1) that plaintiffs could not sustain their burden of establishing that the defendants violated any of their federal or state rights, and (2) that defendants were entitled to qualified immunity. With respect to the claims that are pertinent to this appeal, to wit, plaintiffs' claims under Title III, the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and various provisions of state law, defendants asserted that they had not violated any clearly established rights of the plaintiffs of which a reasonable person would have known and that it was objectively reasonable for defendants to believe that their actions did not violate any clearly established rights. Defendants acknowledged that the goal of the State Police had been to record all conversations on barracks telephone lines available to the public and that taped telephone lines were used for both incoming and outgoing calls. In support of their motion, however, defendants stated, *inter alia*, that the purposes of the recording were to permit review of emergency calls when the message was not clear, to facilitate investigation of civilian complaints against State Police personnel, to establish the timing of complaints and official responses in major criminal investigations, and to determine whether dispatchers and troopers were handling calls properly. (Defendants' Statement of Undisputed Facts ¶ 6.) Defendants stated that

> [o]nly a relatively few recordings of conversations were ever listened to at all, and those few were listened to only by authorized police personnel for the legitimate police purposes described in paragraph 6, above. All others were routinely erased

and taped over without ever being heard. . . .

> 45. There was no intent on the part of the Connecticut State Police or individual officers specifically to record any attorney/client telephone conversations, and to the extent that such conversations may have been recorded it was a by-product of the overall system which automatically recorded all calls, and the calls were never designated to be replayed or listened to. . . .
>
>  . . . .
>
> 48. The State Police did not listen to or replay any attorney/client call which may have been automatically recorded.

(Defendants' Statement of Undisputed Facts ¶¶ 44, 45, 48.)

Plaintiffs, opposing summary judgment, disputed defendants' contentions that the State Police did not intend to capture attorney-client conversations and that troopers neither listened to nor replayed such conversations, pointing to the recording and/or use of attorney-client conversations in the *Ferrell* and *Little* cases. Plaintiffs also pointed out that

> defendants had a policy to permit arrestees and detainees to use State Police telephones to contact their attorneys as well as a policy to record all telephone calls on State Police lines. This is inconsistent with defendants' statement that they did not intend to record attorney/client conversations.

(Plaintiffs['] and Intervening Plaintiffs' Response to Defendants' Statement of Undisputed Facts ¶ 17.)

In a comprehensive opinion, the district court denied defendants' motion for summary judgment dismissing the Title III, Fourth, Fifth, Sixth, and Fourteenth Amendment, and state law claims, finding principally that there were material questions of fact to be tried as to each claim. With respect to the Fourth Amendment claims, the court noted that the two core questions are whether plaintiffs exhibited a subjective expectation of privacy, and if so, whether that expectation was one that society is prepared to recognize as reasonable. The court indicated

that the first question should likely be answered adversely to defendants and that the second was not answerable as a matter of law:

> Defendants first contest that plaintiffs subjectively expected their telephone calls to be private, given that plaintiffs made their calls from a barracks of the State Police. This argument is belied, however, by the fact that both Commissioner Forst and Colonel Mulligan disavowed any knowledge of the extent of the recording practices of the State Police. If those in charge of the State Police can claim no subjective knowledge of the recording of outgoing calls, it must be expected that plaintiffs do likewise.
>
> Defendants also argue that plaintiffs' expectation of privacy was unreasonable.... [W]here no consent exists, and where conversations consist of privileged communications between clients and their attorneys, an expectation of privacy is reasonable.... The surreptitious recording of unprivileged but private calls, if proven, involves an invasion of privacy that far outweighs defendants' proffered justifications.... Ultimately, therefore, *the determination of whether the plaintiffs' expectations of privacy were reasonable depends on proof of the absence of notice, a question of fact precluding summary judgment on plaintiffs' Fourth Amendment claims.*

888 F.Supp. at 1255–56 (emphasis added).

With respect to the Fifth Amendment claims, the court noted that offering an arrestee a telephone while knowing that the call would be secretly recorded could be viewed as the functional equivalent of an interrogation because it would be known to be " 'reasonably likely to elicit an incriminating response.' " *Id.* at 1257 (quoting *Pennsylvania v. Muniz,* 496 U.S. 582, 601, 110 S.Ct. 2638, 2649, 110 L.Ed.2d 528 (1990)). The court further noted that the privilege against self-incrimination "applies not only to evidence which would support a conviction, but to 'information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution.' " 888

F.Supp. at 1257 (quoting *Maness v. Meyers,* 419 U.S. 449, 461, 95 S.Ct. 584, 592, 42 L.Ed.2d 574 (1975)). The court concluded that

> [w]hether such evidence was ever induced through the recording of private calls, or was ever used derivatively in any criminal proceeding, are matters to be established at trial.

888 F.Supp. at 1257.

With respect to the arrestee-plaintiffs' Sixth Amendment claims, the court stated as follows:

> Defendants argue that [the arrestee or detainee] plaintiffs cannot claim the subject matter of their calls was meant to remain confidential, and that in any case any police intrusion caused by the recording was unintentional. As discussed above, however, a reasonable expectation of privacy might have existed. Moreover, defendants admit to taping all calls, to having no unrecorded lines available, and to directing arrestees to use recorded lines. Any resulting recording cannot be said to be inadvertent, and implicates the Sixth Amendment....
>
> *As to arrested plaintiffs, therefore, two significant issues remain for trial: whether the communications between arrestees and their attorneys were intended to remain confidential, and whether it was reasonable for these plaintiffs to expect such communications to be confidential. The question of whether any notification mechanisms (beep tones and warning labels) existed will be central to these inquiries.*

888 F.Supp. at 1258 (emphasis added).

With respect to the rights of all plaintiffs to privacy, as protected by the Fourteenth Amendment, the court stated that "[t]he right to privacy is not violated unless an individual's interest in maintaining confidentiality outweighs the government's interest in disclosure," 888 F.Supp. at 1258–59 (citing *Nixon v. Administrator of General Services,* 433 U.S. 425, 458, 97 S.Ct. 2777, 2798, 53 L.Ed.2d 867 (1977)), but it concluded that none of the governmental interests described by defendants was sufficient to justify the recording of confidential conversations. The

court noted that plaintiffs nonetheless could not prevail on these claims if they had consented to the interception, and it concluded that the matter of whether or not there was notice sufficient to impute consent was a fact remaining for trial.

With respect to the claims under Title III, defendants argued that the State Police recording system was exempt because the tapes were listened to only to the extent necessary to meet emergency and administrative needs, *i.e.*, uses within the Act's exception for legitimate law enforcement activities, *see* 18 U.S.C. § 2510(5)(a)(ii). The court noted that plaintiffs contended, *inter alia*, that the statute was violated by a recorded interception even if defendants did not listen to the conversation, but the court concluded that it need not decide that question because defendants indisputably had listened to some conversations, and whether they had confined that listening to the emergency and administrative matters, as defendants claimed, could not be determined as a matter of law:

> The second element of a section 2520 violation is that a wire, oral, or electronic communication must be intercepted. The statute defines "intercept" to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4)....

> As an initial matter it appears obvious that the defendants' actions often resulted in "interceptions" under any definition of that term. To determine whether the recording of a particular call was needed for emergency or administrative reasons, and hence whether it was an exempt recording under the law enforcement exception, *the State Police would delegate a trooper to listen to all calls in a given time period.* It is undisputed that the State Police's recorders did not possess the capability to locate a particular call automatically. Even under the defendants' proposed interpretation of "interception," therefore, defendants "aurally acquired" plaintiffs' conversations whenever they listened through tapes searching for particular

> calls. *What specific tapes were listened to, and which conversations were therefore "intercepted," as defendants interpret that term, thus would appear to be issues of material fact precluding summary judgment in defendants' favor.*

888 F.Supp. at 1263–64 (emphases added). Further noting that Title III excepts conversations intercepted with the consent of one of the parties, the court reiterated its rejection of defendants' contention that all users of State Police telephones received adequate notice of the recording system, and it observed that "a genuine issue of material fact exists as to whether plaintiffs' consent to the recording can be implied." 888 F.Supp. at 1265; *see also id.* at 1266; ("what none of the parties in this case has established, is whether each caller who made a private or privileged telephone call received notice that the conversation was recorded"); *id.* at 1267 ("it remains a question of fact whether defendants listened to protected conversations while reviewing tapes for other purposes").

The district court concluded that the factual issues precluded summary judgment for defendants on their qualified-immunity defense with respect to any of these claims. The court found that the essential contours of the Fifth and Sixth Amendment rights were sufficiently clear in light of earlier decisions of the United States Supreme Court and the Second Circuit, and in light of the Connecticut Supreme Court's opinion in *Ferrell.* While noting that in some instances it was not clear that plaintiffs' rights were violated under defendants' view of the facts, the court found that with respect to each of plaintiffs' claims there were fact questions to be determined as to which side's view of the facts was correct. Thus, while defendants contended that it was not clearly established at the pertinent times that the constitutional provisions or Title III made it unlawful to record a telephone conversation if the conversation was never listened to, the court concluded that the matter of whether a given conversation was ever listened to was a question of fact for trial. In addition, the court stated that

> [t]he second element of the qualified immunity defense as to the rights of these

plaintiffs rests on disputed issues of fact, precluding summary judgment. Defendants argue, in particular, that notification mechanisms were in place throughout the class period. If such mechanisms were actually implemented and maintained, it would be objectively reasonable for a police officer in defendants' position to believe that the recording of plaintiffs' private conversations occurred with their consent, and thus no Fourth or Fourteenth Amendment violation occurred. Since *the facts relating to notification and plaintiffs' expectations of privacy remain at issue,* however, summary judgment on those claims is inappropriate.

888 F.Supp. at 1261 (emphasis added). With respect to privileged or private telephone conversations, the court found it clear that the law-enforcement exception to Title III did not exempt defendants' conduct from the prohibitions of that statute:

> Defendants cannot plausibly argue that Congress intended the recording of privileged or private conversations in violation of the Constitution, as alleged in this case, to fall under Title III's definition of "law enforcement duties." In sum, plaintiffs' rights under Title III were defined adequately by court decisions and the Act itself during the period in question, and a reasonable official in defendants' position would have understood that the acts alleged by plaintiffs were unlawful under Title III.

888 F.Supp. at 1267 (footnote omitted).

With respect to defendants' awareness of the law, the court found it significant that defendants had made some efforts to warn telephone users of recording:

> [D]efendants admit that they attempted to place beep tones on recorded lines when they first initiated recording, thereby acknowledging a duty not to record conversations without notification. *This acknowledgement is sufficient to raise the question whether it was objectively reasonable for defendants to believe, throughout the class period, that their recording practices did not violate plaintiffs' Title III rights,* given the factual issue whether working beep tones existed on all recorded lines. Defendants therefore fail to establish their qualified immunity defense at this time.

888 F.Supp. at 1268 (emphasis added). As to both constitutional and statutory rights, the court found that in light of the 1986 Attorney General's letter and the 1978 Wire Tapping Manual's admonition that under no circumstances could an attorney-client conversation properly be monitored, "[n]o objectively reasonable police officer, so informed, would believe that the recording of conversations between arrestees and their attorneys was lawful...." *Id.* at 1260; *see also id.* at 1267–68.

The district court similarly ruled that defendants had not shown entitlement to qualified immunity against the state-law claims, in part because in order to establish that defense, defendants would be required to show that their acts did not "involve malice, wantonness or intent to injure," and that they had no knowledge of the specific harm or injury alleged. *Evon v. Andrews,* 211 Conn. 501, 505, 559 A.2d 1131, 1134 (1989). The district court stated:

> Defendants fail to demonstrate their defense of qualified immunity under state law for the reasons stated in the Court's discussion of federal qualified immunity. While it is true, as defendants note, that the Connecticut Supreme Court has never explicitly assessed the practices alleged here, the *Ferrell* decision and the Attorney General's 198[6] opinion letter, in particular, informed defendants that the recording of private or privileged telephone conversations would violate the federal and State constitutions and the State Wiretap Act. *Whether defendants' actions also involved "malice, wantonness, or intent to injure," given defendants' decision to remove the beep tones from recorded lines, remains a question of fact for trial.*

888 F.Supp. at 1270 (emphasis added). The court also found summary judgment inappropriate on the state-law claims because "there exists a genuine issue whether, and to what extent, employees of the State Police reviewed and listened to tapes of private conversations." *Id.* at 1271.

This appeal followed, challenging so much of the district court's order as denied defendants' motion for summary judgment based on qualified immunity.

## II. DISCUSSION

On appeal, the defendant officials argue that they were entitled to summary judgment dismissing the complaint on the ground that reasonable officials could have believed that the State Police taping system was not unlawful because, during the pertinent period, it was not clearly established that Title III or the federal Constitution or state law prohibited the recording of conversations without ever listening to them. Plaintiffs have moved to dismiss the appeal, pointing out that the denial of a summary judgment motion asserting qualified immunity is not immediately appealable unless the denial turned on an issue of law, and that the district court here found numerous genuine issues of material fact to be tried with respect to the qualified-immunity defense, including the questions of whether and to what extent confidential conversations were listened to and/or used.

As to appealability, defendants contend that the district court's rulings that there are issues of fact to be tried are irrelevant because, defendants say, plaintiffs' claims are based solely on the fact that the calls were recorded, and not on any listening or use. (*See, e.g.,* Defendants' brief on appeal at 32 referring to recording without any listening as "*the* claim pursued by these plaintiffs" (emphasis added)); *id.* at 34 (stating that "plaintiffs did not even argue ... that incriminating information was obtained or used through the monitoring of private phone calls"). If defendants were correct in their assertion that plaintiffs claim only that defendants violated their rights by recording conversations, without ever listening to them, the district court's denial of the motion for summary judgment would be immediately appealable, for the issue before us would then turn solely on the purely legal question of whether clearly established law prohibited recording *simpliciter.* Plaintiffs' claims are not, however, simply based on defendants' recording without any listening. The complaints alleged that defendants violated plaintiffs' rights by intercepting, recording, disclosing, and using their confidential telephone conversations. And plaintiffs' brief on appeal states that "[t]heir allegations are not and have never been limited to a violation based solely on recording...." (Plaintiffs' brief on appeal at 16.) Accordingly, defendants' narrow characterization of plaintiffs' claims is a mischaracterization.

As to the merits of their appeal, defendants contend that they are entitled to qualified immunity on the ground that there was no listening by State Police to confidential telephone conversations. Thus, they argue that "recordings of any privileged conversations were erased without being listened to, and ... in any event were never used against the speaker in any judicial proceedings" (Defendants' brief on appeal at 34); that "plaintiffs did not ... offer evidence[ ] that incriminating information was obtained or used through the monitoring of private phone calls" (*id.*); and that there was no evidence or claim that any recorded conversation was ever used even derivatively in any criminal proceeding (*id.* at 34–35 n. 23). We conclude that, in light of the interplay among the principles governing qualified immunity, summary judgment, and appealability, discussed below, defendants' arguments are factually and doctrinally flawed because (a) it is undisputed that the State Police did listen to at least some tapes; (b) on a summary judgment motion made by defendants, the evidence must be viewed in the light most favorable to plaintiffs; (c) defendants' argument that plaintiffs have not proven listening to, or use of, the recorded conversations is misplaced on this appeal because qualified immunity is an affirmative defense as to which defendants have the burden of proof; and (d) defendants' assertion that plaintiffs cannot prove listening or use goes to the merits of plaintiffs' claims, and a denial of summary judgment because of the existence of triable issues of fact with respect to the merits is not immediately appealable.

### A. *Qualified Immunity, Summary Judgment, and Appealability*

▮ The federal doctrine of qualified immunity protects government officials from

suits against them in their individual capacity for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). A right whose existence is indicated by prior case law with "reasonable specificity" is "clearly defined" within the meaning of this doctrine. *See, e.g., Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). Further, though officials are not required "to anticipate subsequent legal developments," *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738, a right may have been clearly defined even if the defendants' specific action had not previously been held unlawful if, " 'in the light of pre-existing law, the unlawfulness [of the action was] . . . apparent,' " *Ayeni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994) (quoting *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039), *cert. denied,* —— U.S. ——, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995). Even if the right in question was clearly established at the time of the alleged violation, however, the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738; *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987).

■■ Qualified immunity is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *see also Harlow v. Fitzgerald,* 457 U.S. at 815, 102 S.Ct. at 2736; *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991). On a motion for summary judgment, of course, the moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle him to judgment as a matter of law, *see, e.g., Adickes v. S.H. Kress & Co.,*

398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and in ruling on such a motion, the district court must draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment, *see, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995). Summary judgment dismissing a claim on the basis of the defendants' qualified-immunity defense may thus be granted if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right. *See, e.g., Robison v. Via,* 821 F.2d at 921; *Halperin v. Kissinger,* 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, J., sitting by designation).

■ Because the defense of qualified immunity is designed to relieve government officials of the burdens of litigation as well as of the threat of damages, summary judgment is encouraged as a device for disposing of claims barred by such immunity. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738; *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992); *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *see also Behrens v. Pelletier,* —— U.S. ——, ——, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996). For much the same reason, although the denial of summary judgment is ordinarily not an appealable "final decision" within the meaning of 28 U.S.C. § 1291 (1994), *see, e.g., Johnson v. Jones,* —— U.S. ——, ——, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995) (the question of whether the evidence adduced by the plaintiff is sufficient to show a genuine triable issue of material fact on the merits of his claim, for example, is not reviewable by appeal from the order denying summary judgment), a limited exception has been carved out for certain

summary rejections of the qualified-immunity defense.

In *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (*"Mitchell"*), the Supreme Court ruled that where a summary judgment motion is based on a substantial claim of qualified immunity, the district court's denial of the motion is immediately appealable under the *Cohen* doctrine (*see Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)), if the denial turned on an issue of law. *See, e.g., Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817; *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990); *see also Johnson v. Jones,* —— U.S. at ——, 115 S.Ct. at 2156. To be appealable under the *Cohen* doctrine,

> the order must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment.

*Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978). Applying *Cohen*'s criteria, the *Mitchell* Court reasoned that the rejection of a qualified-immunity defense as a matter of law should be immediately appealable because the qualified-immunity doctrine

> recognize[s] an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.

472 U.S. at 526, 105 S.Ct. at 2815 (emphasis in original). Once the trial is held, it is too late to vindicate that important purpose of qualified immunity, *i.e.,* allowing the official to avoid standing trial, and the denial is, to that extent, "effectively unreviewable." *Id.* at 527, 105 S.Ct. at 2816. Further, to the extent that the denial of summary judgment turns on a legal issue, the qualified-immunity question is sufficiently separate from the merits of the action that the

appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.

*Id.* at 528, 105 S.Ct. at 2816. The *Mitchell* Court took pains to make clear that the denial of a claim of qualified immunity may appropriately be appealed immediately only

> *"to the extent that it turns on an issue of law."* .... It "emphasize[d] ... that the appealable issue is a purely legal one: whether the facts alleged ... support a claim of violation of clearly established law." .... It distinguished precedent not permitting interlocutory appeals on the ground that "a qualified immunity ruling ... is ... a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." .... And, it explained its separability holding by saying that "[a]n appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts."

*Johnson v. Jones,* —— U.S. at ——, 115 S.Ct. at 2156 (quoting *Mitchell,* 472 U.S. at 528 n. 9, 530, 105 S.Ct. at 2816 n. 9, 2817 (emphasis in *Johnson* )). Thus, where the district court has ruled that adjudication of the immunity defense requires the resolution of genuinely disputed questions of fact, the denial of summary judgment is not immediately appealable. *See, e.g., Cook v. Sheldon,* 41 F.3d 73, 78–79 (2d Cir.1994); *Kaminsky v. Rosenblum,* 929 F.2d at 926–27; *Hurlman v. Rice,* 927 F.2d 74, 79 (2d Cir.1991); *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989); *Mahoney v. Hankin,* 844 F.2d 64, 68–69 (2d

Cir.1988). To be appealable immediately, the qualified-immunity denial must present "'a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.'" *Johnson v. Jones,* — U.S. at —, 115 S.Ct. at 2156 (quoting *Mitchell,* 472 U.S. at 530 n. 10, 105 S.Ct. at 2817 n. 10).

■ In the present case, defendants concede that, to a certain extent, plaintiffs' federal rights were clearly established; but they argue that what was established was a prohibition against listening to confidential conversations, not against recording without any listening, and they assert that in the present case there was no such listening. For example, they term "unsurprising" the district court's "conclusion that the law was clearly established that: (1) arrestees have a right to confidential communication with their attorneys; and (2) individuals with a reasonable expectation of privacy have a right to keep their telephone conversations private." (Defendants' brief on appeal at 32.) They assert that

> [t]he district court's fundamental error stems from its assumption that a recording *that is destroyed without being heard* violates privacy interests to the same extent and in the same manner as a recording this is listened to.

(*Id.* at 33 (emphasis added).) Similarly, while apparently acknowledging the clarity of the Fifth Amendment's guarantee of the arrestee's right to remain silent, right to consult an attorney prior to any police interrogation, and right not to have evidence obtained in violation of those rights used against the him (*see, e.g., id.* at 32, 34), defendants argue that the rejection of their immunity defense with respect to the Fifth Amendment claims was erroneous because

> [t]he court apparently equated *unheard* recordings with interrogation, although it should be obvious that *a conversation that is recorded but destroyed without being heard* cannot provide any information that could be considered "a link in the chain of evidence that could lead to prosecution."

(*Id.* at 34 n. 22 (emphases added).) And defendants argue that all of the authorities discussed by the district court in addressing plaintiffs' claims under the Fourth Amendment and Title III are distinguishable from the present case because those cases dealt with recordings that had been listened to. *See, e.g., Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967) (government's "electronically *listening to and recording* the petitioner's words violated the privacy upon which he justifiably relied ... and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment" (emphasis added)); *United States v. Turk,* 526 F.2d 654, 658 n. 3 (5th Cir.) ("If ... the recording is made, but is destroyed before anyone can hear it, whether there has been an 'aural acquisition' [within the meaning of Title III] is a nice question."), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

Thus, every argument made to us by defendants in support of their qualified-immunity defense depends on their contention that there was no listening to confidential conversations. That, however, is a factual contention that defendants have not established. It is no answer to say, as defendants do, that plaintiffs have produced no specific evidence of listening or use, for on this motion for summary judgment, plaintiffs do not have the burden of proof. To the extent that plaintiffs do have a burden to come forward with sufficient evidence to show a genuine issue to be tried, there is in the record ample evidence that there was State Police listening to at least some recorded conversations. For example, defendant John Bardelli was commanding officer of one troop; and for a time during the period in question, he had responsibility for inspecting the taping systems in all of the barracks. In the latter capacity, Bardelli conducted detailed inspections and routinely instructed a sergeant to select a tape at random, take it to State Police headquarters, and spend a full day listening to conversations on it. Though Bardelli testified that the intent was not to listen to confidential conversations, he acknowledged that the sergeant had access to every conversation on the tape. Since "[i]t is undisputed that the State Police's recorders did not possess the capability to locate a particular call automatically," 888 F.Supp. at 1263, that they

"did not distinguish between incoming and outgoing calls," *id.* at 1242, and that there was no way to tell, without listening, where a given call ended, a rational factfinder could infer that the listening officer would routinely have heard conversations other than those he was entitled to hear, including confidential conversations in outgoing calls made by arrestees.

Bardelli also testified that, with respect to the period in which he was a troop commander, he could not say that all of the recorded telephones in the barracks he commanded bore warning labels; he did not recall whether stickers were placed on telephones in the holding room to indicate taping; he did not know of any warning signs in the holding room to indicate that some lines were recorded; and he did no monitoring to ensure that arrestees had access to an unrecorded line.

There is also evidence from which a rational factfinder could infer that recorded confidential conversations were used against arrestees. For example, Bardelli testified that he was aware that some requests for particular recorded conversations had been received from State's Attorneys. And though defendants state that tapes were routinely erased within 60 days, the tapes of the attorney-client conversations at issue in *Ferrell* remained available some three years after they were made, and the prosecution used them in an attempt to establish that Ferrell had no reasonable expectation of privacy in his statements to his attorneys.

Thus, the record includes evidence from which it could be inferred not only that arrestees had no notice that conversations they expected to be confidential were being recorded, but also that confidential conversations were listened to and used in criminal investigations. Viewed in the light most favorable to plaintiffs as the parties opposing summary judgment, the record more than suffices to show genuine issues of fact to be tried as to, *inter alia,* whether there was listening to, disclosure of, and use of confidential conversations, as plaintiffs have maintained.

In light of these factual issues, the policy considerations underlying the immediate appealability of a denial of summary judgment based on a determination of legal issues, set out in *Mitchell* and adumbrated in *Johnson v. Jones,* are not served by an immediate appeal. The qualified-immunity defense asserted here depends on the resolution of defendants' factual premise that there was no listening to recorded confidential conversations; if the factfinder finds such listening, the qualified-immunity defense will be mooted, for defendants do not contend that they have immunity if there was listening; if the factfinder concludes that there was no such listening but finds in favor of plaintiffs nevertheless, the qualified-immunity defense can be determined at that point. The postponement of consideration of defendants' immunity defense until after trial does not deprive defendants of an opportunity to avoid a trial, for the nature of their defense affords them no such opportunity: recording is conceded, and the immunity defense asserted here cannot be resolved without a trial to determine, *inter alia,* whether there was listening, to what extent there was listening, and whether there was use. Thus, though the qualified-immunity defense is meant to protect defendant officials from going to trial, that defense as asserted here, even if upheld, can have no such effect, for an appellate opinion in favor of either party on the hypothetical legal question posed by defendants would not eliminate the need for a trial on any claim.

### B. *State–Law Immunity*

For similar reasons, we conclude that the district court's denial of summary judgment with respect to defendants' defense of qualified immunity as to plaintiffs' state-law claims is unappealable. The Connecticut eavesdropping statute expressly prohibits the "intentional overhearing *or recording* of a telephonic ... communication," Conn.Gen. Stat. § 53a–187(a)(1) (1994) (emphasis added); *see also id.* § 54–41a(2) (Wiretap Act) (" 'Intercept' means the intentional overhearing *or recording* of a wire communication through the use of any electronic, mechanical or other device." (emphasis added)). Thus, at the time that Connecticut used its taping system, defendants knew or should have known that they were violating rights

that were clearly established under state statutory law.

Under Connecticut law, state officials do not have immunity for such violations if, *inter alia,* their actions were likely to subject an identifiable person to imminent harm or if their alleged misconduct involved malice, wantonness, or the intent to injure. *See Evon v. Andrews,* 211 Conn. at 505, 559 A.2d at 1134. The district court ruled that there were factual questions to be tried as to these immunity issues. That ruling is not appealable.

## CONCLUSION

In sum, the district court in denying defendants' qualified-immunity-based motion for summary judgment, found that there were genuine issues of fact to be tried as to, *inter alia,* whether plaintiffs expected their telephone conversations to be confidential, *see, e.g.,* 888 F.Supp. at 1258, 1261; whether defendants gave telephone users notice of the recording sufficient to make any such expectation of privacy unreasonable, *see, e.g., id.* at 1258, 1259, 1261, 1265, 1266; whether and to what extent defendants listened to tapes of confidential conversations, *see, e.g., id.* at 1263–64, 1267, 1270–71; and whether such conversations were "used" in violation of plaintiffs' Fifth Amendment rights, *see, e.g., id.* at 1257. The availability of qualified immunity depends on the resolution of these fact issues. This is not an appropriate case for an immediate appeal of the denial of defendants' motion for summary judgment.

At trial, the district court should submit to the jury special interrogatories the answers to which will disclose whether any verdict in favor of a plaintiff is based on conversations that were recorded but not used or listened to.

We have considered all of defendants' arguments in support of appealability and have found them to be without merit. The appeal is dismissed for lack of appellate jurisdiction.